# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### February 20, 2013 Session

## JEFF FINCH v. TINA RAYMER, ET AL.

**Direct Appeal from the Chancery Court for Henry County**
**No. 20775     Ron E. Harmon, Chancellor**

_____

**No. W2012-00974-COA-R3-CV - Filed May 6, 2013**

_____

This appeal involves a dispute over property allegedly owned by a partnership. The plaintiff and defendant lived together for about six years but never married. It is undisputed that they formed a partnership during that time for the purpose of buying and selling real estate. The parties bought, renovated, and sold numerous properties, and after they separated, they equally split the remaining profits from the property sales. However, they could not agree as to who owned the house where the parties were currently living and various items of personal property acquired during their relationship. Following a bench trial, the trial court found that all of the disputed property was partnership property and that each party held a one-half undivided interest in the property. Accordingly, the court declared that the parties owned the disputed real property as tenants in common, and it awarded the plaintiff a judgment for one-half of the value of certain personal property. The court also awarded attorney's fees to the plaintiff. The court further concluded that the defendant had fraudulently conveyed partnership property to her father, a co-defendant, and the court set aside the sale and held that the defendant was responsible for repaying to her father the amount he paid for the fraudulently conveyed property. The defendants appeal. We affirm in part, reverse in part, and remand the cause for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part and Remanded**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Phillip G. Hollis, Camden, Tennessee, for the appellants, Tina Raymer, Larry Raymer and wife, Linda Raymer

Terry J. Leonard, Camden, Tennessee, for the appellee, Jeff Finch

**OPINION**

## I.  FACTS & PROCEDURAL HISTORY

Jeffrey Finch filed this lawsuit against his former girlfriend, Tina Raymer, in May 2008.  Mr. Finch's complaint alleged that he and Ms. Raymer cohabited for several years, and during their "co-habitation/partnership," they acquired certain real and personal property as partnership property.  Mr. Finch alleged that when the parties separated, Ms. Raymer ordered him to leave the residence where the parties were residing, despite the fact that it was partnership property, and she refused to divide the parties' personalty.  Mr. Finch further alleged that Ms. Raymer fraudulently conveyed the disputed real property to her parents in an attempt to destroy its status as "partnership property and/or resulting trust property."  Mr. Finch named Ms. Raymer's parents as defendants as well.  By way of an amended complaint, Mr. Finch sought an equal "one-half" division of the alleged partnership property, or property held in trust, and he sought an award of attorney's fees.

The defendants, being Ms. Raymer and her parents, jointly filed an answer denying that any of the disputed property was partnership property.  The defendants claimed that Mr. Finch was "simply the boyfriend of [Ms.] Raymer, and resided with her at her house."[1]  The defendants also alleged that Mr. Finch could not claim an interest in the disputed *real* property due to the statute of frauds.  They argued that any agreement relating to the property had to be in writing and signed by the parties in order to be enforceable.

A bench trial was held on November 10, 2011.  The trial court heard from various witnesses and received several volumes of exhibits.  Mr. Finch testified that he and Ms. Raymer met and began dating around January of 2002.  At that time, Mr. Finch lived in a house in Big Sandy, Tennessee, and Ms. Raymer lived in a mobile home in nearby Paris, Tennessee. Mr. Finch testified that the parties began living together shortly after they started dating, and they resided primarily at Ms. Raymer's residence.  At some point, they leased Mr. Finch's house in Big Sandy to tenants.  Ms. Raymer had a part-time cleaning service and moving business.  Mr. Finch described himself as "a master carpenter and a union boilermaker." He explained that his boilermaker work was seasonal and required a great deal of travel, so he maintained another profession in carpentry.  Mr. Finch said he had been building houses as a carpenter "all [his] life."

Mr. Finch testified that soon after he and Ms. Raymer started dating, her mobile home caught fire.  Ms. Raymer received payment for the damage from her insurer, but she was

---

[1]  The defendants also filed a countercomplaint, which the trial court ultimately dismissed.  That ruling is not challenged on appeal, so we will not discuss the issue further.

permitted to keep the damaged home. Mr. Finch testified that, due to his experience with carpentry, Ms. Raymer asked him if he wanted to "finish" the mobile home, then sell it and split the money with her. Mr. Finch said he agreed to the proposition and did a lot of work on the mobile home repairing the fire damage.

Around this same time, in October 2002, the parties established a joint checking account. Mr. Finch's paychecks from his boilermaker work were deposited in the account, and he earned, on average, about $54,000 per year during the parties' relationship. Mr. Finch testified that when it came time to sell the mobile home, Ms. Raymer asked him if he would be interested in purchasing another house to fix up and sell, and he said that he was. Mr. Finch testified that he and Ms. Raymer looked at another house together in Puryear, Tennessee, which they eventually bought. The Puryear property was titled in Ms. Raymer's name alone, and it was purchased in December 2002 for $23,000 pursuant to a deed of trust she executed for that same amount. The parties moved into the house and renovated it themselves. Mr. Finch testified that the parties completely remodeled the house, doing work on the "walls, floors, ceilings, paint, cabinets, everything, bathroom fixtures, kitchen fixtures, outside, soffit, you name it. Windows, there were broken windows. Central heat and air had to be replaced. Just about everything." Mr. Finch said that Ms. Raymer did painting "and things of that nature," but he described the overall project as a joint effort. The Puryear property was sold just five months after it was purchased, in May 2003, for $50,000, which was $27,000 more than the purchase price.

Just weeks before the sale of the Puryear property, on March 27, 2003, the property that is the main subject of the dispute on appeal was purchased and titled in Ms. Raymer's name alone. The property was located on Pack Hill Road in Springville, Tennessee, and it consisted of about thirteen acres of unimproved property.[2] The deed recited a consideration of $20,000, and Ms. Raymer executed a deed of trust in connection with the purchase for $17,800. Regarding this purchase, Mr. Finch testified, "Ms. Raymer was looking for a place for us to build a new house, and she found this property. She took me out there and showed it to me and asked me what I thought about it. And – and we went from there. We bought it." Mr. Finch testified that he met the sellers, but that he was not present at the closing on the property because he was working. Mr. Finch testified that the purchase price of the land was about $20,000. He said that the parties took the profit from the sale of the Puryear property and "bought" the Pack Hill Road property.[3]

---

[2] The parties apparently lived in a rental house during this period.

[3] According to the deeds, the Pack Hill Road property was purchased on March 27, 2003, a few weeks *before* the sale of the Puryear property on May 16, 2003. Although Mr. Finch testified that the parties
(continued...)

-3-

Mr. Finch testified that he and Ms. Raymer sat down together and looked at books to get ideas for house plans, then they drew up a set of plans themselves. Mr. Finch testified that he and Ms. Raymer's father built the house together. He explained that Ms. Raymer's father was building a house of his own at the time and that the two basically "traded out" work. Mr. Finch testified that construction began in June or July of 2003, and that the interior of the house was completed in December 2003, to the point that he and Ms. Raymer moved into the home together at that time.

The house contained about 2000 square feet. To finance the construction of the home, Ms. Raymer had obtained a construction loan of $70,000 from the local bank, in her name only.[4] Mr. Finch testified that he and Ms. Raymer purchased the lumber for building the house using their joint Lowe's credit card account.[5] He said the parties also bought all new furniture to furnish the house. Around January of 2004, after the house was completed, the construction loan was converted to permanent financing in the form of a $63,000 mortgage. Mr. Finch produced bank statements reflecting that the monthly mortgage payment on the Pack Hill Road property was paid from the parties' joint checking account, and often times, the parties doubled or tripled their payment amounts in an attempt to pay the note off early. In July 2004, the parties sold Mr. Finch's previous home in Big Sandy, which they had leased to tenants for some time. Mr. Finch testified that the parties took the proceeds from the sale and "paid off the house" and the note on his truck, then they used the remainder to build a shop measuring 24 by 36 feet at the Pack Hill Road property. He testified that the parties also continued to improve the exterior of the house by adding porches and a front deck. Mr. Finch testified that, based on his experience in carpentry, and his work in building the house and procuring the materials for it, he would estimate that the reasonable value of the material and labor expended was around $200,000.

A few months after the parties moved into the home, on August 12, 2004, a home equity line of credit loan was obtained against the Pack Hill Road property in the amount of

[3](...continued)
"bought" the Pack Hill Road property with the profit from the sale of the Puryear property, he was not asked about the discrepancy with the timeline of events. It is not clear from the testimony whether Mr. Finch meant that the parties simply used the proceeds of the May 2003 sale of the Puryear property to pay toward the amount financed for the Pack Hill Road property, or whether his testimony was simply inaccurate.

[4] The parties' joint checking account statements revealed several monthly payments to the local bank during that time, but there was no testimony to specifically link these payments to the construction loan.

[5] The statements from the parties' joint checking account indicated that the parties spent approximately $12,000 on housing materials and $5,000 on outside labor from that account during 2003. However, it is not clear from the record whether these funds were spent on the Puryear house, the Pack Hill Road house, or a combination of the two.

$55,000.[6] This loan was obtained by the parties to allow them to buy, renovate, and sell more real estate. Shortly thereafter, on August 17, 2004, Mr. Finch and Ms. Raymer bought an investment property at 311 Cedar Street for $38,001, and the property was jointly titled in both parties' names. Mr. Finch testified that the property was in foreclosure and that they basically had to "redo" the entire house.[7] The parties sold the Cedar Street property in December 2004 for $61,000, for an increase of about $23,000 over the purchase price. The parties' bank statement for their joint checking account reflected that a deposit of nearly $23,000 was made approximately two weeks after the sale. In January 2005, the parties purchased another property that was jointly titled in both their names. They sold the property three months later for about $31,000 more than the price they paid for the property. A deposit of around $26,000 was made to the parties' joint checking account on the day after the sale.

In July 2005, Mr. Finch and Ms. Raymer were co-borrowers on a second home equity line of credit loan against the Pack Hill Road property.[8] The loan amount was $75,000. Like the previous loan, this one was also used to finance the parties' real estate dealings. The parties bought and sold several other properties over the course of the next two years, but we will not belabor this opinion with the details of the transactions. All in all, the parties bought about twelve properties *in addition to* the four properties where the parties lived at various times during their relationship. Of those twelve, one property was titled in Mr. Finch's name alone, two were titled in Ms. Raymer's name alone, and nine were titled jointly. The parties still owned one investment property jointly at the time of trial.

Mr. Finch testified that he and Ms. Raymer worked together renovating the properties that they bought, and that they made money together. He said both parties would search for houses, and they would go and look at houses together. Mr. Finch testified that Ms. Raymer "got into real estate . . . pretty much full time," and she obtained her real estate broker's license at some point.[9] Mr. Finch explained that Ms. Raymer handled the money and the

---

[6] Although it is not clear from the record, according to Ms. Raymer's brief on appeal, this was the first transaction by Mr. Finch and Ms. Raymer as co-borrowers.

[7] Mr. Finch testified that the phrase "redo the house" meant, "Tear up floors, redo plumbing, kitchen, kitchen fixtures, countertops, basement, paint, framing repairs, windows, just anything that needed to be done. Most of the time it was just about everything. These houses are just run do[wn]. A lot of them hadn't been lived in."

[8] The loan documents listed the parties as married.

[9] During the 2011 trial, Ms. Raymer was questioned about this issue as follows:

(continued...)

"business" side of the dealings, and did painting and wallpapering, while he did the "heavy" work. Mr. Finch continued his work as a boilermaker, and whenever he came home from traveling for such work, Ms. Raymer would have a list of repairs for him to complete at the properties. He said he would do "[a]nything and everything that needed to be done, any – any repairs whatsoever, floors, roof, whatever, sheetrock, plumbing, electrical, anything that needed to be done." At least one of the properties was an unimproved lot that did not require work.

Mr. Finch testified that it was his understanding that the proceeds from the sales were deposited in the parties' joint checking account. The cost of insuring the properties (including the investment properties and the Pack Hill Road residence) was paid from the parties' joint checking account. In March 2005, Mr. Finch executed a power of attorney naming Ms. Raymer as his attorney in fact. He explained that he did so because Ms. Raymer sometimes needed to act on his behalf in purchasing properties when he was out of state doing boilermaker work. Mr. Finch testified that Ms. Raymer handled most, if not all, of the subsequent sales by and through the power of attorney.

Mr. Finch testified that he and Ms. Raymer placed some "savings" from the property sales into an ammunition box and buried it underneath the house on Pack Hill Road. He testified that when the parties separated in January 2008, they dug up the box and divided the money inside, which totaled about $80,000. There was no dispute between the parties about the division of this money. However, Mr. Finch testified that Ms. Raymer retained all of the parties' appliances and furnishings, and various disputed items of personal property such as a trailer and a four-wheeler, and she claimed sole ownership of the Pack Hill Road property where they lived. Mr. Finch initially testified that he did not know that his name was not on the deed to the Pack Hill Road property until the parties separated in January 2008, stating that he had been "laboring under the assumption" that his name was on the deed. Mr. Finch noted that he was not present at the closing. On cross-examination, Mr. Finch acknowledged that he and Ms. Raymer had discussed the state of the record title once, before the house was constructed on the property, and Ms. Raymer told him at that time, "'I'm taking care of that and I'll -- I'll sign -- have papers to sign,'" but, Mr. Finch said, "it never happened. I was pretty busy." He said that basically "I never got an answer, and it just went from there." Mr. Finch said, "I was under the impression that was our place." As for the parties' intentions

[9](...continued)

Q.  You've been a licensed realtor as of April 5, 2008, for four years; true?
A.  Repeat that question, please.
Q.  You have been a licensed realtor for four years as of September 5, 2008.
A.  Approximately, yes.

Thus, it is not clear from the testimony when she obtained her license.

with regard to purchasing the Pack Hill Road property, Mr. Finch testified, "we were planning on living there the rest of our lives. You know, I mean, I built that house well because I was – that was my – going to be my home, I assumed." However, upon further questioning, Mr. Finch testified that "the plan" was to sell the Pack Hill Road property for a profit and to build a bigger house. He testified that the parties were already looking for more property.[10] According to Mr. Finch, the parties were basically increasing the value of their properties, from the mobile home to the Puryear house to the Pack Hill Road residence, and so forth.

The parties' neighbors, who owned the farm across the road from the Pack Hill Road property, testified as well. The neighbors basically testified that they saw Mr. Finch building the house and shop on the Pack Hill Road property. They described various specific tasks that they saw Mr. Finch performing during the construction of the house. When one of the neighbors was asked if he saw other people constructing the house as well, the neighbor said, "Mainly, I saw Jeff is the only one I saw."

The community president of the local bank testified about various loans and transactions that involved the parties and their real estate dealings. He was aware that the parties were purchasing properties and that Mr. Finch was repairing them. He also recalled that at least one of the home equity lines of credit against the Pack Hill Road property was established to enable the parties to buy and sell real estate, and he had assumed that both were for that purpose.

Ms. Raymer also testified. Like Mr. Finch, she said that the parties began dating around January or February 2002. She testified that the fire at her mobile home resulted in a "total loss" and that she was compensated by the insurance company, but she was permitted to keep the home. Ms. Raymer testified that the damage to the mobile home was mostly cosmetic, "so," she said, "I refinished the mobile home and I flipped it." Next, Ms. Raymer testified about the Puryear property. She said, "I bought a house that had to be foreclosed on in Puryear." The relevant documents reflected that the Puryear property was titled in Ms. Raymer's name alone, and that the entire purchase price of $23,000 was financed with the bank. As for the renovations, Ms. Raymer testified that the Puryear property "didn't really require a whole lot." She said, "I actually did mostly cosmetic stuff: painting, carpet, some vinyl." Ms. Raymer testified that she lived in the house for about six months before reselling it.

---

[10] The trial court sustained objections to some questions posed to Mr. Finch by his attorney regarding his willingness to sell the Pack Hill Road property, on the basis that he was not the record title holder.

Ms. Raymer basically testified about *her* involvement with these properties with no mention of Mr. Finch. When specifically questioned about Mr. Finch's work on the Puryear property, she admitted, "He did some work on the property; yes." Ms. Raymer was also asked whether Mr. Finch assisted her with carpentry services at the mobile home, to which she responded, "True."

Ms. Raymer went on to testify about the Pack Hill Road property, stating, "I had already purchased my 13 acres [on Pack Hill Road] before I sold Country Club Lane [in Puryear]." She testified that she found the property and contacted the owners, negotiated with them, obtained the loan to purchase the property, and had the property titled in her name when it was purchased on March 27, 2003. Ms. Raymer testified that she bought the property with the intention of building a house on it, and that construction began later that year. She testified that she obtained a construction loan and later converted the loan to permanent financing upon completion of the house. Again, Ms. Raymer did not mention Mr. Finch in her initial account of how these transactions transpired. However, when asked whether Mr. Finch lived at the Pack Hill Road residence with her, she acknowledged that he did. Ms. Raymer testified that she and Mr. Finch had not purchased any property "in both [their] names" at that time, and that the first property they purchased "together" was the 311 Cedar Street property in August 2004. When asked about Mr. Finch's contributions at some of the properties they purchased, Ms. Raymer would generally say she did not recall if he did any work there, or something like, "if he did, it wasn't much." However, she responded "Yes" when, on cross-examination, Mr. Finch's counsel stated, "Now, throughout the course of your relationship with Mr. Finch, in addition to providing labor, material, [and] carpentry services to various properties that y'all would buy, he also was a boilermaker by trade."

Ms. Raymer testified that when the parties separated in January 2008, they dug up their savings in the ammunition box and split it "on the spot." The parties went to the bank and removed Mr. Finch's name from the joint checking account, and Ms. Raymer paid him for one-half of the balance of the joint checking account. About three months after the breakup, on April 10, 2008, Ms. Raymer deeded the Pack Hill Road property to her parents for $30,000. She testified that she conveyed the property to them because she had less income at that time due to a decline in the real estate market, and she wanted to avoid the possibility of being late on payments, ruining her credit, or facing foreclosure. Ms. Raymer acknowledged that the remaining mortgage balance on the Pack Hill Road property was "a small amount," around $30,000, and that the monthly mortgage payment was $368. She also admitted that during the same month that she conveyed the property to her parents, she purchased a tractor and mower for about $13,000, and she later paid for breast implants for around $5,000. Ms. Raymer eventually conceded that she conveyed the property to her parents in order to protect herself from "[s]omebody claiming ownership in my property." She admitted that she deeded the property away, at least "[i]n part," to protect herself from

Mr. Finch.

Ms. Raymer was asked about a financial statement she submitted to the local bank in January 2007, in which she had estimated that the value of the Pack Hill Road residence was $279,000. The following exchange took place between Ms. Raymer and counsel for Mr. Finch:

Q. Okay. And you wouldn't lie on personal financial statements, would you, ma'am?
A. Probably I would.
Q. Is there something funny?
A. Yeah, there is.
Q. This is funny today.
A. Exactly, yes, to be honest.

Ms. Raymer testified that despite what her financial statement stated, the amount she listed was not her opinion as to the value of the property.

Ms. Raymer's parents, Larry and Linda Raymer, testified as well. Mr. Larry Raymer was a licensed electrician. He testified that he and Mr. Finch worked together on the construction of the Pack Hill Road residence and on the house that Ms. Raymer's parents were building at the time. He described Mr. Finch as a good carpenter and a good laborer. He acknowledged that during his deposition in September 2008, just months after the property was deeded to him by his daughter for $30,000, he estimated that the value of the Pack Hill Road property exceeded $200,000. Mr. Raymer testified that he agreed with his daughter's in-court testimony about why she deeded the property to him and his wife. He would not agree with the suggestion by Mr. Finch's attorney that Ms. Raymer was trying to keep the property away from Mr. Finch, stating, "She didn't tell me that, so I'm not going to say yes." Ms. Raymer's mother similarly testified that Ms. Raymer asked them to buy the property because she was not making any money in real estate. Ms. Raymer's mother testified that she and her husband "gave her thirty thousand dollars to pay off the mortgage, and we got the deed." She said they told Ms. Raymer that she could continue living at the Pack Hill Road property in order to take care of it.

A licensed real estate appraiser testified as well. He had performed a certified appraisal of the Pack Hill Road property and concluded that the fair market value of the property was $170,000 as of April 11, 2008, when it was conveyed to Ms. Raymer's parents for $30,000.

After the trial concluded, the trial court entered a judgment containing the following findings:

This matter was tried on November 10, 2011, at which time the Court heard testimony from the parties and attending witnesses. The Court [f]inds these parties have lived together for several years, during which time the Defendant, Tina Raymer earned an average of Ten Thousand ($10,000) Dollars per year and the Plaintiff, Jeff Finch, earned an average of approximately Fifty Four Thousand ($54,000) Dollars per year. The Plaintiff [Jeff Finch] deposited all of this [sic] earnings into the parties' joint check[ing] account. The proof revealed that business expenses and living expenses were totally paid out of that account.

At the time the parties separated, they owned real property located at 618 Pack Hill Road, valued in excess of Two Hundred Thousand ($200,000) Dollars. During the parties' relationship, they had purchased numerous items of realty and re-sold or flipped the property, each time buying more expensive and larger tracts for their next acquisition. Some of the properties they had sold were also properties they had resided in. In addition to the 618 Pack Hill Road property where the parties' resided at the time of the separation, they also owned real property located at Turkey Trot Lane in Benton County, Tennessee.

The parties together accumulated certain personal property which included a 4000 Ford tractor, bush hog, 16 foot bumper hitch trailer, a 500 Polaris four wheeler, an auto body rotisserie, [and] a 1965 For[d] Mustang. The household goods, furnishings and appliances owned by the parties had an undisputed value of Thirty Thousand ($30,000) Dollars. All of the foregoing property was purchased from the sale of partnership property combined with Plaintiff's income. The Court finds that a partnership existed between these parties and that all of the foregoing property was owned one-half undivided interest by the Plaintiff, Jeff Finch, and a one-half undivided interest by the Defendant, Tina Raymer.

After the parties' separation, the Defendant, Tina Raymer, conveyed the 618 Pack Hill property to her father for the sum of Thirty Thousand ($30,000) Dollars, the property having been acquired in her name alone. The parties, during the time they owned the real estate, had constructed a dwelling with not only the monies earned by the Plaintiff [Jeff Finch], but by his labors. Mr. Finch had been engaged in the construction of the residence located on the 618 Pack Hill property.

The Court found Defendant, Tina Raymer's testimony to be elusive, deceitful and outright false. Her actions constitute fraudulent misconduct in the conveyance of the real property and the secreting of other property. The

-10-

Court finds that the conveyance by Tina Raymer to Larry Raymer and wife, Linda Raymer was fraudulent and shall be set aside and declared void and for naught. This property shall be owned as equal tenants in common between the parties.

The personal property aforementioned as well as the real property located on Turkey Trot Lane in Benton County, the Court finds to be jointly owned by the parties, each owning a one-half undivided interest.

The Court finds the conduct of the Defendant, Tina Raymer to be so outrageous that she should be taxed with all costs in this cause, together with the Plaintiff's reasonable attorney fees. She shall also be solely responsible for the repayment of the Thirty Thousand ($30,000) to her father which she received from the sham land transaction.

In summary, the order reiterated the trial court's finding that a partnership existed, and "that based upon the evidence entered, exhibits, credibility and demeanor of witnesses and the entire record, that the purchase of real property and personal property was from partnership property as well as the Plaintiff's income." The order divested title of the Pack Hill Road property from Ms. Raymer's parents and vested title in Mr. Finch and Ms. Raymer "to be held by each with a one-half undivided interest and same is held as tenants in common." The court held that the specific items of personal property – including the tractor, bush hog, trailer, four wheeler, auto body rotisserie, and 1965 Ford Mustang – were all partnership property, and therefore, Mr. Finch and Ms. Raymer each held a one-half undivided interest in those items. The trial court also awarded Mr. Finch a $15,000 judgment, representing one-half of the value of the household goods, furnishings and appliances located at 618 Pack Hill Road. Finally, the court stated that Ms. Raymer's actions concerning the conveyance to her parents "constituted fraudulent misconduct," and her testimony was "elusive, deceitful and outright false," and "thus, Plaintiff [was] awarded his reasonable attorney's fees in the amount of $20,312.50[.]" Ms. Raymer and her parents timely filed a notice of appeal.

## II.   ISSUES PRESENTED

On appeal, the defendants present several issues for review, slightly restated, as follows:

1.      Whether the trial court erred in awarding Mr. Finch a one-half interest in the Pack Hill Road property because it did not qualify as partnership property,
2.      Whether the trial court erred in awarding Mr. Finch a judgment for $15,000 representing his interest in various items of personal property when the record established the items were not partnership property;
3.      Whether the trial court's award to Mr. Finch of a one-half interest in the Pack Hill

Road property was contrary to the statute of frauds;

4.      Whether the trial court erred in finding that Ms. Raymer was responsible for repaying her father for the $30,000 she received from the sham land sale transaction; and

5.      Whether the trial court erred in awarding attorney's fees to Mr. Finch.

For the following reasons, we affirm the decision of the chancery court in part, and we reverse in part, and we remand this cause for further proceedings consistent with this opinion.

## III.   STANDARD OF REVIEW

Because this case was tried to the trial judge without a jury, on appeal the trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2012); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). "When credibility and weight to be given testimony are at issue, considerable deference must be afforded the trial court when the trial judge had the opportunity to observe the witness' demeanor and to hear in-court testimony." *Mitchell v. Fayetteville Public Utilities*, 368 S.W.3d 442, 447-48 (Tenn. 2012) (citing *Whirlpool Corp. v. Nakhoneinh*, 69 S.W.3d 164, 167 (Tenn. 2002)). "If the trial court's factual determinations are based on its assessment of witness credibility, this Court will not reevaluate that assessment absent clear and convincing evidence to the contrary." *Milledgeville United Methodist Church v. Melton*, 388 S.W.3d 280, 285 (Tenn. Ct. App. 2012) (citing *Heffington v. Heffington*, No. M2009-00434-COA-R3-CV, 2010 WL 623629 (Tenn. Ct. App. Feb. 19, 2010)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV.   DISCUSSION

### A.   Partnership Property

On appeal, Ms. Raymer and her parents concede that "Tina Raymer and Jeff Finch were partners or joint venturers in several properties purchased between August 17, 2004 and February 5, 2007." Nevertheless, they argue that there was "no evidence in the record that the Pack Hill Road real estate or the items of personalty were partnership property" because "[t]here is no evidence in the record that either the Pack Hill Road property or the items of

personal property were acquired for the production of income or for sale for profit." They claim that the Pack Hill Road property was held "simply as a residence," and that the personalty was "clearly just household goods[.]" They also point to Mr. Finch's deposition testimony suggesting that he knew that his name was not on the deed to the Pack Hill Road property to support their argument that he had no ownership interest in the property.

A general overview of partnership law is helpful to an understanding of the issues raised on appeal.[11] Tennessee's version of the Revised Uniform Partnership Act provides that "the association of two (2) or more persons to carry on as co-owners of a business for profit forms a partnership, whether or not the persons intend to form a partnership." Tenn. Code Ann. § 61-1-202(a). In other words, "[i]f the parties' business brings them within the scope of a joint business undertaking for mutual profit—that is to say if they place their money, assets, labor, or skill in commerce with the understanding that profits will be shared between them—the result is a partnership whether or not the parties understood that it would be so." **Bass v. Bass**, 814 S.W.2d 38, 41 (Tenn. 1991) (citing *Pritchett v. Thomas Plater & Co.*, 144 Tenn. 406, 232 S.W. 961, 969-70 (1921)). The sharing of profits creates a rebuttable presumption of a partnership.[12] Tenn. Code Ann. § 61-1-202(c)(3) & statutory cmt. 3. However, in determining whether a partnership exists, no one fact or circumstance is conclusive. **Martin v. Coleman**, 19 S.W.3d 757, 761 (Tenn. 2000). "[A]ll of the relevant

---

[11] Because the parties never married, we are guided by the ordinary laws of partnership rather than domestic relations law. **Wyatt v. Byrd**, No. W2009-02635-COA-R3-CV, 2010 WL 3063153, at *3 (Tenn. Ct. App. Aug. 3, 2010) (citing *Story v. Lanier*, 166 S.W.3d 167, 177 (Tenn. Ct. App. 2004)). Accordingly, "'we are directed to focus our attention upon the facts as they relate to the parties' decision to enter th[e] particular transaction, not the facts as they relate to domestic matters.'" **Montgomery v. Montgomery**, 181 S.W.3d 720, 727 (Tenn. Ct. App. 2005) (quoting *Story*, 166 S.W.3d at 178-79). *See, e.g.*, **Martin v. Coleman**, 19 S.W.3d 757, 760-61 (Tenn. 2000) (involving cohabitants with a partnership in a used car business, where one party's retirement benefits from another employer were not partnership property because there was no contribution to the benefits from the used car business or from the other party, and her contribution as a homemaker could not be considered).

[12] The statute contains several exceptions to this rule (not applicable here) for certain "protected categories" of transactions, in which case the receipt of a share of the profits is not presumed to create a partnership. *See* Tenn. Code Ann. § 61-1-202(c)(3) ("A person who receives a share of the profits of a business is presumed to be a partner in the business, *unless* the profits were received in payment: (A) of a debt . . . (B) for services as an independent contractor or of wages or other compensation to an employee; (C) of rent; (D) of an annuity or other retirement or health benefit to a beneficiary, representative, or designee of a deceased or retired partner; (E) of interest or other charge on a loan . . . or (F) for the sale of the goodwill of a business or other property[.]") (emphasis added). These protected categories are "shield[ed] from the presumption" of a partnership. Tenn. Code Ann. § 61-1-202 cmt. 3.

facts, actions, and conduct of the parties must be considered."[13] *Id.*

Property that is "acquired by" a partnership is property of the partnership, as an entity, and not property of the partners individually. Tenn. Code Ann. § 61-1-203. The issue of when property is "acquired by" a partnership is governed by Tennessee Code Annotated section 61-1-204. The statute begins by stating, in subsection (a), that property is deemed partnership property if acquired in the name of the partnership or in the name of one or more of the partners *with* an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership. Tenn. Code Ann. § 61-1-204(a). Obviously, that is the ideal situation when trying to ascertain the partners' intent, and the easiest scenario to resolve, but it is inapplicable here. The statute goes on to provide two rebuttable presumptions that apply when the partners have failed to express their intent by referring to the existence of a partnership in the title documents. First, subsection (c) provides that "[p]roperty is presumed to be partnership property *if purchased with partnership assets*, even if not acquired in the name of the partnership or of one (1) or more partners with an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership." Tenn. Code Ann. § 61-1-204(c) (emphasis added). Simply put, "property purchased with partnership funds is presumed to be partnership property, notwithstanding the name in which title is held." Tenn. Code Ann. § 61-1-204 cmt. 3. The second, related presumption is found in subsection (d) of the statute, which provides that "[p]roperty acquired in the name of one (1) or more of the partners, without an indication in the instrument transferring title to the property of the person's capacity as a partner or of the existence of a partnership *and without use of partnership assets*, is presumed to be separate property, even if used for partnership purposes." Tenn. Code Ann. § 61-1-204(d) (emphasis added).

In summary, then, real property owned by a partnership may be held either in the partnership's name or in the name of one or more of the partners, and so "the record title of a piece of property does not necessarily reveal whether the property belongs to the owners of record or to a partnership of which the owners of record are members." *Leckrone v. Walker*, No. M1998-00974-COA-R3-CV, 2002 WL 773147, at *3 (Tenn. Ct. App. Apr. 30, 2002) (citing *Hunt & Co. v. Benson*, 21 Tenn. (2 Hum.) 459, 460-61 (1841)). "Historically, it has not been unusual for partnership property to be held in the name of a partner and never conveyed formally to the partnership at all." 4 Caroline N. Brown, *Corbin on Contracts* §

---

[13] "When a partnership agreement is not in writing, the party alleging the existence of a partnership carries the burden of proving that fact by clear and convincing evidence." *Story*, 166 S.W.3d at 175.

17.12, at 467 (1997). "At least among the partners themselves,[14] determining whether property belongs to the partnership or to one or more of the partners in their individual capacities depends on the partners' intentions and understandings." *Leckrone*, 2002 WL 773147, at *3 (citing *Boyers v. Elliott*, 26 Tenn. (7 Hum.) 204, 207 (1846); *Young v. Cooper*, 30 Tenn. App. 55, 67, 203 S.W.2d 376, 382 (1947); *Jenkins v. Harris*, 19 Tenn. App. 113, 121, 83 S.W.2d 562, 566-67 (1935)). "Ultimately, it is the intention of the partners that controls whether property belongs to the partnership or to one or more of the partners in their individual capacities[.]" Tenn. Code Ann. § 61-1-204 cmt. 3. The aforementioned rebuttable presumptions found in Tennessee Code Annotated section 61-1-204 draw an inference concerning the partners' intent from the use of partnership funds. Tenn. Code Ann. § 61-1-204 cmt. 4. However, "[u]sing partnership funds to purchase the property is not the only basis upon which these decisions are made." *Leckrone*, 2002 WL 773147, at *3 (citing *In re Fair Oaks, Ltd.*, 168 B.R. 397, 402 (B.A.P. 9th Cir.1994); *King v. Evans*, 791 S.W.2d 531, 533 (Tex. App. 1990)). "The courts regularly derive the partners' intentions and understandings by considering: (1) the parties' statements, conduct, and writings when the property was acquired, (2) the parties' course of conduct after the acquisition of the property, (3) the use of the property in the partnership business, (4) the terms of the partnership agreement, (5) the listing of the property as an asset on the partnership books and tax returns, (6) the attribution of profits or losses from the property to the partnership, and (7) the use of partnership funds to maintain the property." *Id.* (citing *Davis v. Loring*, No. 01A01-9004-CV-00149, 1991 WL 32311, at *2 (Tenn. Ct. App. Mar.13, 1991)).

Individual partners in a partnership have a fiduciary relationship with the other partners and with the partnership itself. *Leckrone*, 2002 WL 773147, at *4 (citing *Cude v. Couch*, 588 S.W.2d 554, 555 (Tenn. 1979); *Killebrew v. Ray*, 181 Tenn. 333, 337, 181 S.W.2d 334, 336 (1944)). "Thus, when property is acquired for partnership purposes but is held in the name of one or more of the partners, equity recognizes the existence of a resulting trust[15] for the benefit of the partnership." *Id.* (citing *Boyers*, 26 Tenn. (7 Hum.) at 208).

---

[14] "The courts must consider other matters when the rights of third parties will be affected by a decision regarding the ownership of property." *Leckrone*, 2002 WL 773147, at *3 n.9 (citing Tenn. Code Ann. § 61-1-302(b)).

[15] As noted in *Leckrone*, 2002 WL 773147, at *4 n.11:

A resulting trust is a judge-made vehicle that enables the courts to reach an interest in property belonging to one person but titled in another. *Wells v. Wells*, 556 S.W.2d 769, 771 (Tenn. Ct. App. 1977). Its principal purpose is to prevent unjust enrichment. *Green v. Hooton*, 624 S.W.2d 898, 902 (Tenn. Ct. App. 1981). The courts will impose a resulting trust when a person acquires a legal estate in property under circumstances indicating that the beneficial interest in the property does not accompany the title. William H. Inman,

(continued...)

-15-

Determining whether property being held in the name of a partner is partnership property is a question of fact; however, because the partnership's claim hinges on the imposition of a resulting trust, the partnership must prove its claim by more than a preponderance of the evidence. *Id.* A party seeking to impose a resulting trust on a legal interest in property must establish the grounds for the trust by clear and convincing evidence. *Id.* (citing *In re Estate of Nichols*, 856 S.W.2d at 401; *In re Estate of Wardell*, 674 S.W.2d 293, 295 (Tenn. Ct. App. 1983)). Therefore, each of the trial court's factual findings will be presumed correct, unless the preponderance of the evidence is otherwise; then, we must determine whether the facts, either as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for imposing a resulting trust on the interest in property. *Id.*

We now turn to the facts of the case before us. Again, the defendants concede that a partnership existed between Mr. Finch and Ms. Raymer with regard to the properties that were purchased between 2004 and 2007. However, they claim that the Pack Hill Road property, purchased in 2003, and the household furnishings and appliances there, were not partnership property because there was no evidence to demonstrate that these assets were held for the production of income. The trial court found that a partnership existed between the parties and that all of the disputed property was partnership property. The court found that the parties had purchased numerous items of realty during their relationship and re-sold or flipped the properties, each time buying more expensive and larger tracts for their next acquisition. The court noted that the parties had resided in some of these properties, and that when they separated, they owned the Pack Hill Road residence and one other property. The court found that the parties had constructed the Pack Hill Road residence "with not only the monies earned by [Mr. Finch], but by his labors," as he was physically engaged in constructing the house. The court also noted the personal property that the parties accumulated. It found that "[a]ll of the foregoing property was purchased from the sale of partnership property combined with [Mr. Finch's] income." As such, the court concluded that all of the disputed property was partnership property, and therefore, each party owned a one-half interest in the assets.

We agree with the trial court's conclusion that the Pack Hill Road residence was partnership property. Again, "[p]roperty is presumed to be partnership property if purchased with partnership assets," Tenn. Code Ann. § 61-1-204(c), but ultimately, it is the intention

---

[15](...continued)
*Gibson's Suits In Chancery* § 382 (7th ed. 1988). In other words, a resulting trust arises when "one person becomes invested with a legal title but is obligated in equity to hold his legal title for the benefit of another." *In re Estate of Nichols*, 856 S.W.2d 397, 401 (Tenn. 1993).

of the partners that controls whether the property belonged to the partnership or to one of the partners in an individual capacity, Tenn. Code Ann. § 61-1-204 cmt. 3; *Leckrone*, 2002 WL 773147, at *3, and we must consider all of the relevant circumstances. Here, Mr. Finch testified that he and Ms. Raymer entered into an agreement after her mobile home caught fire, not long after they started dating in 2002, whereby he would contribute his carpentry services to "finish" the mobile home, then they would sell it and split the money. The parties moved into the home together and renovated it. Mr. Finch testified that when it was time to sell the mobile home, Ms. Raymer asked if he would be interested in purchasing another house to fix up and sell, and he said that he was. Regarding the parties' agreement, he said, "starting out, she said we would do this and split the money, but instead of splitting the money, we started buying more property and just continued on making money, getting houses." Mr. Finch testified that they bought the house in Puryear, renovated it, and sold it for a profit in a matter of months. When Mr. Finch was asked what the parties did with the profit from the sale of the Puryear home, he said they "bought" the Pack Hill Road property, which consisted of about thirteen acres of unimproved land. We acknowledge that this testimony could be construed as inconsistent with the timeline of events evidenced by the deeds, which indicate that the Pack Hill Road acreage was purchased for $20,000 on March 27, 2003 and financed with a $17,800 deed of trust, and that the Puryear house was not sold until a few weeks later, on May 16, 2003. Mr. Finch was not questioned about this discrepancy at trial. It may be that Mr. Finch meant that the parties used the $27,000 profit from the Puryear house to pay off the note on the Pack Hill Road property, or, the testimony may have been incorrect. The trial court observed Mr. Finch's testimony and concluded that the Pack Hill Road property was purchased with partnership property. In any event, even if we find that the money from the sale of the Puryear home was not the same money used to make the down payment on the Pack Hill Road property at closing, that does not mean that the Pack Hill Road property was not partnership property. *See Norris v. Norris*, No. 03A01-9403-CH-00101, 1994 WL 529405, at *8 (Tenn. Ct. App. E.S. Sept. 15, 1994) (finding that the conduct of cohabitants after the purchase of their home indicated that the home was the base of operations for their business ventures and therefore partnership property, even though it was not purchased with partnership funds). The direct source of the funds used for the down payment on the acreage is not conclusive for purposes of our analysis. We derive the partners' intentions and understandings with regard to the property by considering numerous factors, mentioned above. The first two are "the parties' statements, conduct, and writings when the property was acquired" and "the parties' course of conduct after the acquisition of the property." *Leckrone*, 2002 WL 773147, at *3. We find it significant that the two previous houses where the parties lived, prior to Pack Hill Road, were, undisputedly, the subject of a partnership agreement between Mr. Finch and Ms. Raymer, whereby the parties would combine "their money, assets, labor, or skill" with the understanding that profits

-17-

would be shared between them.[16] *See **Bass***, 814 S.W.2d at 41. This evidence clearly and convincingly shows that the parties' partnership began with their agreement with regard to the mobile home in 2002. The partnership continued with the purchase of the Puryear home in December 2002 and the other properties that followed.[17] As Mr. Finch put it, instead of splitting the money, the parties just kept buying houses. It is undisputed that the properties purchased by the parties *after* the purchase of the Pack Hill Road property, whether titled in the name of Mr. Finch, Ms. Raymer, or both, were partnership assets. Basically, the defendants would have us believe that every property purchased during the parties' relationship was partnership property *except* this one. We find no support for this position. Although the Pack Hill Road property was titled solely in Ms. Raymer's name, like the two properties where they lived before, Mr. Finch testified that the parties looked at the Pack Hill Road property together and made a decision together to purchase it. He said, "Ms. Raymer was looking for a place for us to build a new house, and she found this property. She took me out there and showed it to me and asked me what I thought about it. And -- and we went from there. We bought it." Mr. Finch testified that he met the sellers but that he did not attend the closing because he was working. The parties drew up plans for the house together, and it is undisputed that Mr. Finch contributed his labor, carpentry skill, and earnings to the construction of the residence and the shop on the property. Mr. Finch and Ms. Raymer jointly executed documents regarding the homeowner's insurance policy insuring the property. Another factor for consideration is "the use of partnership funds to maintain the property." ***Leckrone***, 2002 WL 773147, at *3. The defendants do not dispute that the profits of the partnership between 2004 and 2007 were deposited into the joint checking account, and the parties used that account, containing partnership funds, to pay for improving, insuring, and maintaining the Pack Hill Road residence. Partnership funds from the joint account were used to pay the monthly mortgage payment on the Pack Hill Road residence (once the construction loan was converted to permanent financing), and the monthly payments were often doubled or tripled. In April 2008, just three months after the parties separated, the remaining mortgage balance on the Pack Hill Road property was only $30,000. Another relevant factor for consideration is "the use of the property in the partnership business." ***Id.*** at *3. Mr. Finch reported on his individual tax returns that the business

---

[16] During Ms. Raymer's testimony, she did not dispute Mr. Finch's testimony about the parties' agreements with regard to the mobile home and the Puryear house. She simply testified, "I" did this or "I" did that, without mentioning Mr. Finch. The trial court found her testimony "elusive, deceitful, and outright false." When specifically asked about Mr. Finch's involvement, Ms. Raymer conceded that he worked on both the mobile home and the Puryear house.

[17] We find that the parties entered into one partnership with one ultimate goal, which was described by Mr. Finch as, "to make money." *Compare **Montgomery***, 181 S.W.3d at 734 (finding a single implied partnership between cohabitants that included several business ventures, including the operation of a masonry business, an insurance business, a marina, a mini-mall, two gyms, and an apartment complex ).

address for his carpentry business was 618 Pack Hill Road. Mr. Finch and Ms. Raymer were co-borrowers on the home equity line of credit against the Pack Hill Road property, which enabled them to buy and sell more real estate in their partnership dealings.[18] Both Mr. Finch and Ms. Raymer signed the deed of trust as "Grantors" and warranted that they were lawfully seized of the estate (i.e., the Pack Hill Road property) and had the right to convey the property. There is no indication that Ms. Raymer objected to these representations by Mr. Finch, as she signed the document with him.

Considering all the circumstances, we conclude that the parties' conduct with regard to the Pack Hill Road residence was consistent with that of co-owners and partners. We therefore find that it was the intention of the parties that the Pack Hill Road property would be an asset of the partnership and not the individual property of Ms. Raymer. Mr. Finch established by clear and convincing evidence that the Pack Hill Road property was acquired for partnership purposes, although titled in Ms. Raymer's name alone, and therefore it was necessary to impose a resulting trust in order to prevent unjust enrichment.

As for the disputed household appliances and furnishings,[19] the only testimony regarding these items came from Mr. Finch. He testified that "we went and picked out furniture and bought all new – new everything." The trial court found that the household items were purchased with partnership funds combined with Mr. Finch's income, and therefore, they were partnership property. On appeal, the defendants do not challenge the trial court's finding as to the source of the funds used to purchase the property. They simply argue that household furnishings and appliances cannot qualify as partnership assets because they are not held for sale or profit. We are not aware of any requirement that a partnership can only own assets that are income-producing or listed for sale. The defendants' argument would be more relevant if we were deciding whether a partnership existed in the first place, and these assets were the basis for deciding whether Mr. Finch and Ms. Raymer had pursued a business venture for profit. But here, we have already concluded that a partnership existed, and the defendants do not challenge the trial court's finding that these items were purchased

---

[18] The remaining factors listed in *Leckrone* do not weigh in favor of either party: the terms of the partnership agreement, the listing of the property as an asset on the partnership books and tax returns, and the attribution of profits or losses from the property to the partnership.

[19] The defendants do not challenge the trial court's classification of the specific items of personal property, such as the tractor, bushhog, trailer, etc. The trial court found that each party owned a one-half interest in those items. The defendants framed their issue on appeal as whether the trial court erred in awarding Mr. Finch a judgment for $15,000 representing his one-half interest in certain items of personal property. The $15,000 judgment was to compensate Mr. Finch for his interest in the $30,000 of household goods, furnishings, and appliances the parties bought for the Pack Hill Road residence. So, we will not address the other items of property such as the tractor, bushhog, trailer, etc.

with partnership assets. The only argument raised by the defendants is that property cannot qualify as partnership assets when it is not held for sale or profit. Finding no merit in the defendants' sole argument on appeal with regard to this property, we affirm the trial court's finding that the assets were partnership property owned one-half by each partner.

## B. Statute of Frauds

The defendants argue on appeal that the trial court erred as a matter of law when it awarded Mr. Finch a one-half interest in the Pack Hill Road real estate "because there is no writing signed by Tina Raymer agreeing to convey any interest in her real property to [Mr. Finch]," and therefore, Mr. Finch's claim to an interest in the property is unenforceable. They argue, "No exception to the Statute of Frauds exists for partnership real estate." As support for their argument on appeal, the defendants rely upon *Curtis v. Rice*, No. 01-A-01-9605-CH-00211, 1996 WL 694156, at *1 (Tenn. Ct. App. Dec. 5, 1996) *perm. app. denied* (Tenn. Feb. 23, 1998), where the Middle Section of this Court held that the statute of frauds applied to a transaction whereby two individual partners orally agreed to contribute property they already owned to their newly created partnership. The trial court held that the statute of frauds was inapplicable to the "contribution" of the partners' land to the partnership, because it was not a "sale" of land. *Id.* at *2. The Court of Appeals reversed, holding that the statute of frauds was applicable to such a transaction. The Court explained, "The contribution of real estate to a partnership is no different than a sale because it clearly affects the title to the real estate. To construe such a transaction otherwise is to defeat rather than to carry out the purpose of the statute." *Id.* at *4. We find that *Curtis* is distinguishable from the facts before us because this case does not involve an oral agreement to contribute to a partnership real property that was already owned by an individual prior to the formation of the partnership.[20]

In a case decided after *Curtis*, the Middle Section of this Court held that "the statute of frauds cannot be used to defeat a partnership's claim that one or more of its partners are holding legal title to property for the partnership's benefit." *Leckrone v. Walker*, No.

---

[20] "There is a conflict in the decisions as to whether land owned by an individual prior to the formation of a partnership may be transformed into an asset of the partnership without the execution of some writing sufficient to satisfy the requirements of the Statute of Frauds with respect to transfers of interests in land." 72 Am. Jur. 2d *Statute of Frauds* § 68; *see also* W. E. Shipley, Annotation, *When real estate owned by partner before formation of partnership will be deemed to have become asset of firm,* 45 A.L.R.2d 1009 (noting "considerable conflict" in the decisions). However, cases involving "partnerships formed for the purpose of selling real estate already owned by one or more of the contracting parties" have been held to be "clearly distinguishable" from cases involving "agreements to share in the profits of sales of lands thereafter to be acquired." G.J.C., *Applicability of Statute of Frauds to joint adventure or partnership to deal in real estate*, 18 A.L.R. 484.

M1998-00974-COA-R3-CV, 2002 WL 773147, at *3 (Tenn. Ct. App. Dec. 5, 2002). Judge (now Justice) Koch, writing for the Court, explained that "when property is acquired for partnership purposes but is held in the name of one or more of the partners, equity recognizes the existence of a resulting trust for the benefit of the partnership." *Id.* at *4 (citations and footnote omitted). A resulting trust may be established using parol evidence. *Id.* (citing *Hunt v. Hunt*, 169 Tenn. 1, 9, 80 S.W.2d 666, 669 (1935); *Hoffner v. Hoffner*, 32 Tenn. App. 98, 103, 221 S.W.2d 907, 909 (1949)). Consequently, the **Leckrone** Court concluded that "neither the lack of a written conveyance nor the statute of frauds will defeat a partnership's claim that one or more of its partners is holding legal title to property for the partnership's benefit." *Id.* (citing *King*, 791 S.W.2d at 532 (lack of a written conveyance); *Davis v. Sheerin*, 754 S.W.2d 375, 386 (Tex. App. 1988) (statute of frauds)).[21] The Court found that the statute of frauds did not prevent the introduction of parol evidence to establish the grounds for imposing a resulting trust on the alleged partnership property. *Id.*; *see also* 68 C.J.S. *Partnership* § 118 ("Parol evidence is admissible to show that land which has been deeded to one or more of the partners, as individuals, is partnership property when the question of ownership arises between the partners or their heirs and personal representatives[.]")

We agree with the Court's reasoning in **Leckrone**.[22] As such, "neither the lack of a written conveyance nor the statute of frauds" will defeat Mr. Finch's claim that Ms. Raymer was holding legal title to the Pack Hill Road property for the partnership's benefit. 2002 WL 773147, at *3.

### C.    *Repayment to Ms. Raymer's Father*

The next issue raised by the defendants is whether the trial court erred in holding that Ms. Raymer was responsible for repaying her father, co-defendant Larry Raymer, the

---

[21] The Texas case of **Davis v. Sheerin**, cited in **Leckrone**, also recognized the distinction between situations involving property allegedly acquired for a partnership but titled in one partner's name, and those involving property that was individually owned by one partner prior to the formation of the partnership. 754 S.W.2d at 386.

[22] *Corbin on Contracts*, § 17.12, suggests that the provisions of the Uniform Partnership Act provide "adequate protection from fraudulent or mistaken claims of other partners" and "lend reliability to the identification of partnership property and the interests of the partners in it," which leaves "little necessity for the protection of the statute of frauds." The author notes the conflict between the UPA's endorsement of informal partnerships and the requirements of the statute of frauds, and concludes that "injustice is more apt to be avoided by giving effect to the oral partnership agreement under the U.P.A.'s liberal rule rather than by refusing enforcement under the statute of frauds." *Id.*

-21-

$30,000 she received from the fraudulent conveyance.[23]  The defendants (including Larry Raymer) argue that "the Thirty Thousand ($30,000.00) Dollar judgment against Tina Raymer and in favor of Larry Raymer was not a claim and was beyond the issues joined by the pleadings and proof."  It is not entirely clear to us that the trial court ordered Ms. Raymer to pay this amount to her father.  The final order did not award a judgment to Larry Raymer.  It set aside the fraudulent conveyance, vested title in Mr. Finch and Ms. Raymer as tenants in common, and stated that "the indebtedness due and owing by Defendant, Tina Raymer, unto Larry Raymer and wife, Linda Raymer is hereby solely the responsibility of, Defendant, Tina Raymer and she shall assume same and hold Plaintiff, Jeff Finch, harmless."  The order stated that Ms. Raymer would be "solely responsible for the repayment of the Thirty Thousand ($30,000) to her father which she received from the sham land transaction."  Thus, it appears that the court was attempting to clarify that, to the extent that there was any obligation to repay Ms. Raymer's parents due to the setting aside of the conveyance, that obligation did not lie with Mr. Finch.  On the other hand, the court did state that the indebtedness was "due and owing" and that Ms. Raymer was "responsible for the repayment."

To the extent that the trial court's order does require Ms. Raymer to pay $30,000 to her father, such an order was beyond the scope of the pleadings.[24]

> Courts can only act upon such matters as are properly brought before them by the parties. *Randolph v. Merchant's Nat'l. Bank of Memphis*, 77 Tenn. 63, 68 (1882). The court can not rightfully notice a matter, however clearly proved, of which there is no allegation or issue in the pleadings. *Id.* A judgment that departs from the pleadings will be void because "it would be altogether arbitrary and unjust and conclude a point upon which the parties had not been heard." *Fid.-Phenix Fire Ins. Co. of New York v. Jackson*, 181 S.W.2d 625, 629 (1944).

*Saweres v. Royal Net Auto Sale, Inc.*, No. M2010-01807-COA-R3-CV, 2011 WL 3370350, at *3 (Tenn. Ct. App. Aug. 1, 2011).  Co-defendant Larry Raymer did not file any type of claim against his daughter, Tina Raymer, and there was no mention of repayment during the bench trial.  Therefore, we vacate the aforementioned provisions of the trial court's order regarding repayment to Larry Raymer.

---

[23]  We note that the defendants do not challenge the trial court's conclusion that the conveyance was, in fact, fraudulent.

[24]  Mr. Finch's brief on appeal states that he "takes no issue with" the defendants' appeal of this matter "in that same does not concern him."

### D. *Attorney's Fees*

Finally, the defendants argue that the award of attorney's fees to Mr. Finch violated the so-called "American Rule" because it had no statutory or contractual basis. "Tennessee, like most jurisdictions, adheres to the 'American rule' for award[s] of attorney fees." ***Cracker Barrel Old Country Store, Inc. v. Epperson***, 284 S.W.3d 303, 308 (Tenn. 2009) (citing *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn. 1998); *Pullman Standard, Inc. v. Abex Corp.*, 693 S.W.2d 336, 338 (Tenn. 1985)). "Under the American rule, a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case." ***Id.*** Thus, a prevailing litigant cannot ordinarily collect attorney's fees "'however wrongful may have been the suit, or however groundless the defense.'" ***Roberts v. Sanders***, No. M1998-00957-COA-R3-CV, 2002 WL 256740, at *10 (Tenn. Ct. App. Feb. 22, 2002) (quoting *Corinth Bank & Trust Co. v. Security Nat'l Bank*, 148 Tenn. 136, 154, 252 S.W. 1001, 1006 (1923)); *see also **Hewgley v. Vivo***, No. 01A01-9506-CH-00266, 1997 WL 92077, at *3-4 (Tenn. Ct. App. Mar. 5, 1997).

Here, the trial court's order stated, "The Court finds the conduct of the Defendant, Tina Raymer to be so outrageous that she should be taxed with all costs in this cause, together with the Plaintiff's reasonable attorney fees." On appeal, Mr. Finch argues that an award of attorney's fees was proper because there is an "exception" to the American Rule for "cases involving libel of title."[25] We do not dispute that courts have recognized "a narrow exception to the 'American Rule' for slander of title actions involving the willful publication of false and malicious statements disparaging another's interest in real or personal property by persons who recognize or should recognize that the statements are likely to cause pecuniary harm." ***Hewgley***, 1997 WL 92077, at *4. However, this case does not involve a claim for libel or slander of title. *Cf.* ***Kinzel Springs Partnership v. King***, No. E2008-01555-COA-R3-CV, 2009 WL 2341546, at *16 (Tenn. Ct. App. July 30, 2009) *perm. app. denied* (Tenn. Feb. 22, 2010) (affirming an award of attorney's fees in an action to quiet title, where the complaint did not expressly state a claim for libel of title, but the issue was tried by acquiescence of the trial court). Here, the trial court's award was apparently based upon its disapproval of Ms. Raymer's conduct. Finding no basis for such an award, we vacate the

---

[25] "To establish a successful claim for slander of title, a plaintiff must prove: (1) that it has an interest in the property, (2) that the defendant published false statements about the title to the property, (3) that the defendant was acting maliciously, and (4) that the false statements proximately caused the plaintiff a pecuniary loss." ***Brooks v. Brake***, No. 01A01-9508-CH-00365, 1996 WL 252322, at *3 (Tenn. Ct. App. May 15, 1996). "Litigants who successfully defend a libel of title action may recover reasonable expenses incurred in defending that suit," including attorney's fees. ***Id.***

award of attorney's fees to Mr. Finch.

## V.   CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed in part, and reversed in part, and remanded for further proceedings consistent with this opinion.  Costs of this appeal are taxed to the appellants, Tina Raymer, Larry Raymer, and Linda Raymer, and their surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.